UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SHAWN BIBBY,                          :
                                      :        HONORABLE JOSEPH E. IRENAS
        Plaintiff,                    :
                                      :        CIVIL ACTION NO. 1:06-cv-289
        v.                            :
                                      :
COMMERCE BANCORP, INC.                :              **OPINION**
and COMMERCE INSURANCE                :
SERVICES, INC.                        :
                                      :
        Defendants.                   :


**APPEARANCES:**

KARPF, KARPF & VIRANT
By:  Ari. R. Karpf, Esq.
3070 Bristol Pike
Building 2, Suite 231
Bensalem, PA 19020
        Counsel for Plaintiff

BROWN & CONNERY, LLP
By:  Susan M. Leming, Esq.
360 Haddon Avenue
Westmont, NJ 08108
        Counsel for Defendants


**IRENAS**, Senior District Judge:

        Plaintiff, Shawn Bibby, brings this employment

discrimination action against Commerce Bancorp, Inc. and its

subsidiary, Commerce Insurance Services, Inc. (collectively

"Commerce" or "Defendants").  Bibby alleges that Commerce

violated 42 U.S.C. § 1981 (Count One) and the New Jersey Law

Against Discrimination ("NJLAD"),  N.J. Stat. Ann. §§ 10:5-1 to -

49 (Count Two) by failing to hire him and terminating him on account of his race.  Bibby further avers that Commerce retaliated against him in violation of the NJLAD (Count Three).[1] For the reasons set forth below, the Court will grant Defendants' motion for summary judgment on all counts.

## I.

In March 2003, Bibby began his employment with Commerce Bank as a Loan Escrow Analyst.  (Defs. 56.1 Stat. ¶¶ 2-3; Bibby Dep. 44:17-23).[2]  He later applied for the position of Insurance Apprentice in April 2005 within the Personal Lines Division of Commerce Insurance Services ("CIS").[3]  (Bibby Dep. 68:14-19; Defs. 56.1 Stat. ¶ 4).  By letter dated June 24, 2005, Bonnie Wideman, a Senior Human Resources Representative with CIS, offered Bibby a position as an Insurance Apprentice in CIS's Insurance Apprentice Program ("IAP"), which Bibby accepted. (Defs. Ex. 15 at 1).  Bibby, along with six other apprentices,

---

[1]This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

[2]  References to "56.1 Stat." pertain to the statements of material facts submitted by Bibby and by Commerce.

[3]  After Bibby filed his Complaint, Commerce Insurance Services became Commerce Banc Insurance Services.  However, to maintain consistency with the terms used throughout the record, the Court will continue to use the name Commerce Insurance Services.

began the IAP training on July 11, 2005.[4]  (Bibby Dep. 94:15-95:24; Defs. Ex. 15 at 1; Compl. ¶ 12).  Bibby was the only African American in his IAP class. (Pls. 56.1 Stat. ¶ 7; Rose Dep. 22:16-19).

The purpose of the IAP, which runs approximately six months, is to help individuals with little or no experience in the insurance industry train to become customer service representatives in either the Personal Lines Division or Commercial Lines Division of CIS.  (Defs. Ex. 16 at 1).  Upon successful completion of the IAP, an apprentice is typically promoted to a customer service representative position; however, there is no guarantee of employment following the six-month training period, as any promotion is based on the apprentice's performance within the program and the availability of positions in his specific division (*i.e.*, the Personal or Commercial Lines Division).[5]  (Defs. 56.1 Stat. ¶¶ 17-18; Defs. Ex. 16 at 1;

---

[4]Some witnesses testify that there were only four apprentices in Bibby's class.  Although it is not clearly addressed in the record, it appears that there were two separate training programs offered by Commerce simultaneously – one for Personal Lines and one for Commercial Lines – and that the two programs combined had a total of seven apprentices.

[5]A document outlining the terms and conditions of the program stated that, "[u]pon successful completion of the program, an Apprentice will be promoted into either an Assistant [customer service representative or customer service representative] position.  Naturally, promotion is based on performance within the program and available positions.  Commerce Insurance Services is a 24/7 business, which requires flexible scheduling (off-shift) and weekend hours." (Defs. Ex. 16).  Bibby

Helbling Dep. 32:9-14).

When the IAP was nearing its conclusion, Wideman would request that managers throughout the Personal Lines and Commercial Lines Divisions submit a list of any open positions. (Wideman Dep. 15:22-16:6).  Wideman would then aggregate the various available positions and forward the list to Philip Helbling[6] and Bernadette Rose,[7] members of CIS management responsible for overseeing the IAP, who would then convey the list of open positions to the apprentices.  (*Id*. at 16:13-17).

Bibby's apprenticeship lasted from July 11, 2005 to January 6, 2006.  During this time, Bibby and his fellow apprentices each received at least one performance appraisal.  In this appraisal, the apprentices received scores ranging from two to four in seven different categories for a total of twenty-eight possible points.  These categories included such criteria as attendance and professional demeanor.  When comparing the cumulative scores, Bibby scored the second highest among the seven apprentices.[8]

-------------------

acknowledged his receipt of this document. (*Id*.)

[6]  Philip Helbling is a Career Development Manager for CIS. (Helbling Dep. 8:16-17).

[7]  Bernadette Rose is an Insurance Training Manager for the Personal Lines Division of CIS.  (Rose Dep. 7:15-20).

[8]We note that the appraisals themselves did not provide a cumulative score and that those apprentices in the Commercial Lines class were scored in several additional categories.  We are thus totaling only those categories for which all apprentices were ranked.  The apprentices in Bibby's class received the

(Pls. 56.1 Stat. ¶¶ 24-29; Pls. Exs. 12-18).

During the course of Bibby's training at the IAP, conditions in the New Jersey insurance market changed, which resulted in CIS receiving a lower volume of customer service calls than it had received in previous years.  (Defs. 56.1 Stat. ¶ 22; Wideman Dep. 14:16-15:6; Helbling Dep. 22:23-23:24).  As a consequence of the downward turn in the personal lines sector of the insurance industry and the reduction in call volume, it became evident to CIS management responsible for overseeing the IAP that there would likely be a shortage of available positions in the Personal Lines Division at the conclusion of the apprentice program. (Wideman Dep. 14:16-15:6; Defs. 56.1 Stat. ¶¶ 22-24; Rose Dep. 25:20-27:2).  In the fall of 2005, the Personal Lines Division instituted a hiring freeze, and the apprentice class was notified that there may be a lack of available positions when they completed their program.  (Defs. 56.1 Stat. ¶ 25; Rose Dep. 25:23-28:24).  Because of the shortage of job opportunities in the Personal Lines Division, Rose, Wideman and Helbling reached out to other departments within Commerce to make additional opportunities available to the apprentices. (Defs. 56.1 Stat. ¶ 28; 24:21-26:21).  Additionally, as a result of the downturn in

---

following cumulative scores: Lisa Kisshauer - 23.5; Shawn Bibby - 22.5; Alfred Kirk - 22; Dolores Martinez - 22; Brad Schoudt - 22; Jayme Lawrence - 21.5; and Brenda Czach - 19.8. (Pls. 56.1 Stat. ¶¶ 24-29; Pls. Exs. 12-18).

the market, Commerce eliminated several positions within the Personal Lines Division in January 2006.  (Defs. Ex. 29).

During his apprenticeship, Bibby interviewed with five hiring managers and expressed interest in numerous other Commerce positions.  In September 2005, Commerce representatives notified the apprentices of two openings as Employee Benefits Apprentices. Bibby chose not to apply for these positions, and they were filled by other classmates.[9]  (Bibby Dep. 106:14-107:23).

Bibby also expressed interest in two other positions within Employee Benefits in October 2005: a Benefits Broker Service Representative position ("Benefits Broker") in Cherry Hill and an Insurance Producer - Commercial Lines position ("Insurance Producer").  (Defs. 56.1 Stat. ¶¶ 35-36). In response to Bibby's interest, Wideman informed Bibby that the Insurance Producer position required additional qualifications and that the Benefits Broker position had been filled. (*Id.*)

In September 2005, Bibby applied for a position as a Major Accounts representative under the supervision of Robert Tanke. Bibby and classmates Brenda Czach and Alfred Kirk applied for this position, but Tanke ultimately selected Kirk, a white male. (Bibby Dep. 111:18-117:3).  Bibby testified that Tanke behaved properly during the interview and that he did not have any

---

[9]These positions were filled by Brad Schoudt and Jayme Lawrence.

specific facts or evidence to show that Tanke made his decision based on race. (*Id.*) However, Bibby believed Tanke preferred a white male to himself.[10] (*Id.*)

Later that fall, Bibby applied for two positions: a position in the VIP-Premier Client Group Section ("VIP-Premier") managed by Catherine Lunn and a position in Policyholder Services under Megan Nobles. (Bibby Dep. 117:23-121:17). Lunn selected Bibby's classmate, Dolores Martinez, who is Latino, for the VIP-Premier position. (*Id.*; Lunn Dep. 23:16-19). Lunn testified that, although Bibby was qualified for the position, she hired Ms. Martinez because she "felt that Dolores was a better fit for my department from a personality perspective." (Lunn Dep. 23:16-19). Bibby interviewed with Nobles for the Policyholder Services position, although this position was ultimately eliminated. (Bibby Dep. 117:23-121:17). Bibby also applied for a position in Loan Services in December 2005 and interviewed with supervisor Lynn Mertz. (Bibby Dep. 141:22-143:18). Wideman testified that Bibby did not express interest in this position during the interview with Mertz. (Wideman Dep. 42:21-45:14; Defs. Ex. 21).

Later that month, Bibby applied for positions as an Accounts Payable Processor ("Accounts Payable") and Operations Assistant.

---

[10]In response to questioning regarding the history of his hiring practices, Tanke stated that he has hired a "couple" of African Americans and approximately four or five Caucasians. (Tanke Dep. 22:2-18).

(Defs. Ex. 66; Wideman 40:6-42:5).  The Accounts Payable position was already closed at the time Bibby submitted his application. (Wideman Dep. 40:6-20).  While Wideman was not sure why Bibby was not interviewed for the Operations Assistant position, she testified that the position was filled very shortly after Bibby applied.  (Wideman Dep. 40:21-42:5).

Bibby also spoke with supervisor Lawrence Hickman in December 2005 regarding the availability of an overnight position as a Personal Lines Customer Service Representative ("Personal Lines").  According to Hickman, an African American, Bibby said "he would think about" the position, but Bibby failed to contact Hickman to express further interest.

Additionally, in December 2005, Bibby expressed interest in three other positions to Rose and Wideman, although they informed him that he lacked the minimum qualifications for the positions as they were not apprentice openings.[11]  (Defs. 56.1 Stat. ¶ 64; Defs. Ex. 21).  During the course of his conversation with Wideman regarding such positions, Bibby further stated that he would did not want to make the necessary commute for these positions. (*Id.*)

_____

[11]Specifically, Bibby expressed interest in the following positions: Customer Service Representative in the Public Entity Division in Toms River, Customer Service Representative for Commercial Lines in the Commerce "Main Street" Complex in Delaware, and Employee Benefit Sales Coordinator in Montclair. (Defs. 56.1 Stat. ¶ 64; Defs. Ex. 21).

8

Bibby states that he made two verbal complaints to Commerce representatives, Tiffany Banks and a Ms. Scarnagle,[12] regarding the alleged discriminatory treatment.  (Pls. 56.1 Stat. ¶ 58; Ex. 10, Int. #7).  Although Bibby made reference to such complaints in his own answers to interrogatories, these complaints are not documented further in the record nor elucidated upon in any of the deposition testimony.

Throughout the duration of Bibby's employment with Commerce, Wideman, Rose and Helbling continued to work with Bibby to find him permanent employment with Commerce.  (Defs. 56.1 Stat. ¶¶ 51-61, 65, 69-72).  They regularly apprised him of recent job openings and met with him multiple times to discuss his progress and status of obtaining employment.  (*Id.*)  Helbling further arranged for Bibby's last day of work to be extended a week in order to facilitate Bibby's job search.  (*Id.*) Commerce representatives informed Bibby on multiple occasions that he would be terminated if he did not obtain a permanent position with Commerce by the end of the IAP.  (*Id.*) As Bibby failed to ever obtain a permanent position, he was terminated the last day of the IAP, January 6, 2006. (*Id.*)

---

[12]Ms. Scarnagle was never deposed and neither party includes her first name in any of their briefing or supporting documents. Neither the division of Commerce where Ms. Scarnagle was employed, nor the position she held, is clear.

On January 20, 2006, Bibby filed this action.[13]  Defendants thereafter filed the present motion for summary judgment.

## II.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).

In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party.  *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the non-moving party bears the burden of proof, the burden on the moving party may be discharged by 'showing'- that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Conoshenti v. Public Serv. Elec. & Gas*, 364 F.3d 135, 145-46 (3d Cir. 2004) (quoting *Celotex*).  The role of the Court is not "to weigh the evidence and determine the truth of the matter, but to determine

---

[13]Bibby seeks compensatory and punitive damages in his Complaint.

whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.

In Counts One and Two of the Complaint, Bibby alleges that he was unlawfully terminated, and concurrently not hired, following the completion of the IAP because of his race in violation of 42 U.S.C. § 1981 ("§ 1981") and the NJLAD.[14]  The Court will review Bibby's § 1981 claim and NJLAD claim together as they arise out of the same set of events and are analyzed under the same standards.[15]  *See Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498-99 (3d Cir. 1999) (analysis of a NJLAD claim generally follows that of a Title VII claim, and the elements of an employment discrimination case under § 1981 are identical to that of a Title VII claim).

Bibby's claims under § 1981 and the NJLAD are governed by the burden-shifting principles set forth by the Supreme Court:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of

---

[14]Although Bibby does not refer to a specific provision of the NJLAD in his Complaint, he does reference N.J. Stat. Ann. § 10:5-12(a) and (d) in his brief.

[15]N.J. Stat. Ann. § 10:5-12(a) provides it is an unlawful employment practice for an employer, on the basis of race, "to refuse to hire or employ or to bar or to discharge . . . from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981) (citations omitted) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).[16]

A.

To establish a prima facie case of employment discrimination, the plaintiff must show:

(1) that he is a member of a protected class; (2) that he is qualified for the position; (3) that he was either not hired or fired from that position; (4) under circumstances that give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class.

*Jones v. Sch. Dist. of Phil.*, 198 F.3d 403, 410-11 (3d Cir. 1999) (internal quotation marks omitted).

The Court notes at the onset that there were a number of

---

[16] The Supreme Court has extended the *McDonnell Douglas* burden shifting framework to cases arising under § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (holding that the same burden shifting analysis used for a case alleging a cause of action under Title VII of the Civil Rights Act of 1964 should also be applied in cases alleging a cause of action under § 1981).

positions that were made available to Bibby during the IAP for which he did not apply.[17]  Additionally, the Benefits Broker and the Accounts Payable positions were filled prior to Bibby's application.  We do not think it relevant to include these positions in our analysis as the Plaintiff could not or chose not to ultimately pursue these positions.

It is uncontested that Bibby, an African American, is a member of a protected class and that he was not hired for any of the positions.  (Compl. ¶ 7; Defs. 56.1 Stat. ¶ 74).  Because the Policyholder Services position was ultimately eliminated, the Court cannot say that Bibby was not hired for this position under circumstances showing a preference for a non-protected class. With respect to the VIP-Premier position, Bibby does not appear to argue that he was subject to discriminatory treatment, presumably because this position was ultimately filled by a minority; however, the Court holds that Bibby establishes a prima facie case of discrimination with this position because it must consider the facts in a light most favorable to Bibby.

With respect to the five remaining positions – Major

_____

[17]Bibby chose not to apply for the Employee Benefits Apprentice position and the Personal Lines position.  Bibby also did not apply for the Insurance Producer position, the two Customer Service Representative positions and the Employee Benefits Sales Coordinator positions as Wideman advised him he did not possess the minimum qualifications because they were not apprentice openings.  There was also evidence that Bibby did not want these latter three positions because of the requisite commute.

Accounts, VIP-Premier, Loan Services, Operations Assistant Position, and Personal Lines – we find that Bibby was qualified for these positions and that such positions were not ultimately given to members of Bibby's protected class.  The Court therefore holds that Bibby has established a prima facie case of employment discrimination for these five positions.  Based on these same facts, the Court also holds that Bibby has established a prima facie case of unlawful termination.

B.

When a plaintiff satisfies his initial burden under *McDonnell Douglas*, he establishes a rebuttable presumption of discriminatory intent on behalf of the defendant.  The burden then shifts to the employer to put forward a "legitimate, nondiscriminatory reason" for the adverse employment action.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).  The employer is not required to persuade the court that the legitimate, nondiscriminatory reason actually motivated its decision, as "[i]t is sufficient if the defendant's evidence raises a genuine issue of material fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254.

Commerce has put forth substantial evidence to establish why it could not continue to employ Bibby at the conclusion of the

14

IAP.  Several Commerce representatives testified regarding the
downturn in the insurance market in late 2005 and the hiring
freeze imposed at Commerce.  Such testimony is further
corroborated by the fact that Commerce laid off employees from
the Personal Lines division in January 2006, the same month as
Bibby's termination.  While Bibby was the only apprentice in his
program that completed the program and was not ultimately hired
by Commerce,[18] there is substantial evidence showing that
Commerce had legitimate reasons for not selecting Bibby for each
position.  Further, Bibby failed to pursue a number of the
apprentice openings that were ultimately filled by his
classmates.

With respect to specific positions, Commerce contends that,
based on a consideration of all of the candidates, it determined
that Al Kirk was the most qualified for the Major Accounts
position.  Although Robert Tanke testified that he neither
recalled interviewing Bibby nor maintained records documenting
the interview, there is evidence in the record showing that Mr.
Kirk completed the IAP and received favorable remarks on his
Apprentice Performance Appraisal.[19]  Likewise, regarding the VIP-

---

[18]Brenda Czach, one of the apprentices in Bibby's class, was
terminated prior to completion of the program.

[19]Bibby argues that he was more qualified than Kirk because
he outscored Kirk on the Apprentice Performance Appraisal.
Although Kirk was in a different apprenticeship program and
received a more detailed performance appraisal, Bibby only scored

Premier position, we find that Catherine Lunn articulated a legitimate reason for hiring Dolores Martinez over Bibby as she perceived Martinez as a better fit for her department.[20]

With respect to the Loan Services position, Mertz believed that Bibby did not express interest in the position during the interview. Similarly, Hickman testified that, in response to Hickman's request that Bibby contact him if he wanted to pursue the Personal Lines position, Bibby never responded. Finally, Wideman testified that the Operations Assistant position was filled shortly after Bibby applied for this position and that, therefore, they likely already had a candidate selected.

As the Defendants have put forth legitimate, non-discriminatory reasons for not placing Bibby in another position following the conclusion of the apprenticeship program, the burden shifts back to Plaintiff to show that such reasons are pretextual.

C.

A plaintiff in a disparate treatment case may avoid summary judgment by adducing evidence that:

---

half a point higher than Kirk (out of a maximum of 28 points) when comparing their cumulative scores.

[20]In response to questioning regarding whether Bibby ever filed a complaint regarding the hiring of Martinez, Bibby testified "No. Why would I complain about her being hired?" (Bibby Dep. 121:13-17).

> 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994).  Thus, "the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)."  *Id*.

Here, Bibby has failed to put forth any evidence that would cast doubt on the validity of the reasons proffered by Defendants.  In support of his argument that the Defendants' reasons are pretextual, Bibby repeatedly emphasizes that he obtained the second-highest score of his apprentice class.  Although it is unclear how much weight the apprentice appraisal scores are even given when making employment determinations, four of Bibby's classmates (out of a class of seven) scored within one point of Bibby.[21]  Given the similarity of the scores, the Court does not find Bibby's argument persuasive.

In support of Bibby's pretext argument, he further points to the fact that he was the only African American in the program and

---

[21]The classmate scoring 2.7 points below Bibby, Brenda Czach, was terminated at some point during the program.

that he was the only apprentice not to obtain employment at the completion of the IAP.  While the Court recognizes that these facts alone may seem suspicious, Bibby has failed to set forth evidence that would cast doubt on each of the legitimate reasons set out by the Defendants in support of their hiring decisions. Further, there is simply no evidence that racial animus motivated any of the Defendants' hiring decisions or that there is a pattern or practice of discrimination on the part of the Defendants.  On the contrary, the Court finds that Commerce representatives repeatedly attempted to help Bibby secure permanent employment with Commerce.

The Court therefore grants Defendants' motion for summary judgment on Counts One and Two of Bibby's Complaint.


**III.**

Count Three of Bibby's Complaint alleges retaliation in violation of the NJLAD.[22]  In alleging a cause of action for discriminatory retaliation, a plaintiff must demonstrate that: (1) he engaged in a protected activity known to the employer; (2) thereafter the employer unlawfully retaliated against him; and (3) his participation in the protected activity caused the

---

[22]The NJLAD prohibits "[r]eprisals against any person . . . because that person has filed a complaint, testified or assisted in any proceeding under this act. . . ."  N.J. Stat. Ann. § 10:5-12(d).

retaliation.  *Craig v. Suburban Cablevision, Inc.,* 140 N.J. 623, 629-30 (1995); *Young v. Hobart Group*, 385 N.J. Super. 448, 465 (App. Div. 2005).  The New Jersey Supreme Court has further stated, "[t]he central element of a retaliatory discharge claim under [NJLAD] is that the plaintiff be 'engaged in a protected activity, which is known to the alleged retaliator.'" *Erickson v. Marsh & McLennan Co., Inc.*, 117 N.J. 539, 560 (1990)(quoting *Velantzas v. Colgate-Palmolive Co.*, 109 N.J. 189, 193 n.1 (1988)).

As evidence that he engaged in a protected activity, Bibby alleges that he complained of racial discrimination to Tiffany Banks, a Commerce Bank Compliance Manager, and Ms. Scarnagle in December of 2005.  (Pl. 56.1 Stat. ¶ 58; Defs. Ex. 4 ¶ 7).

With the exception of Bibby's own responses to interrogatories, there is no evidence in the record to substantiate Bibby's claim that he made such complaints to Commerce representatives.[23]  Bibby's Complaint does not include an allegation that Bibby engaged in any form of protected activity, that Defendants had knowledge of Bibby's involvement in a protected activity, or that Commerce retaliated against Bibby

---

[23]Banks testified at her deposition that she had no idea who Bibby was and had no recollection of a phone conversation with Bibby in which he complained that he felt he was being discriminated against by CIS employees.  (Banks Dep. 14:16-15:11).

as a result of Bibby's involvement in a protected activity. (*See* Compl. ¶ 27).

Likewise, Bibby offers no evidence that any of the IAP coordinators responsible for terminating Bibby or making the hiring decisions knew of his complaints to Banks and Scarnagle. Bibby had the opportunity to depose Rose, Helbling, and Wideman, and at no point during their depositions did they ever testify as to their knowledge of Bibby's alleged complaints. Instead, Bibby argues that Rose, Helbling and Wideman should have known because Banks would have typically conveyed such information to Wideman as a matter of protocol.[24] With such speculative evidence regarding Wideman's knowledge of the complaint, we cannot conclude that she was aware of the alleged complaint or that her awareness of the complaint caused the ultimate decision to terminate Bibby.[25] Based on the dearth of evidence Bibby has offered in support of his retaliation claim, the Court will grant Defendants' motion for summary judgment as to Count Three of the Complaint.

---

[24]Banks, as Manager of Compliance, did not handle complaints herself, but would pass such complaints along to the Employee Relations department or the attorneys at Commerce. Banks thought that Wideman may ultimately handle a complaint made from the employee services section.

[25]There is no deposition testimony regarding Wideman's awareness of Bibby's alleged complaints to Banks and Scarnagle.

**IV.**

For the reasons set forth above, Defendants' motion for summary judgment on all counts of Plaintiff's Complaint will be granted.  The Court will issue an appropriate Order.


Dated: March 17, 2008.


s/ *Joseph E. Irenas*
**JOSEPH E. IRENAS, S.U.S.D.J.**

21